IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-215 |
| REUBEN KING | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
*MOTION TO SET ASIDE THE VERDICT AND FORFEITURE OR ALTERNATIVELY, RENEWED MOTION TO DISMISS INDICTMENT*

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Joseph A. LaBar, Assistant United States Attorney, submits the following response in opposition to the defendant's *Motion to Set Aside The Verdict And Forfeiture Or Alternatively, Renewed Motion To Dismiss Indictment.* For the reasons set forth below, the defendant's motion should be denied.

**I.      PROCEDURAL BACKGROUND**

The defendant, Reuben King, was indicted by a grand jury on June 28, 2022. He was charged with one count of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A). He filed a pretrial motion to dismiss that indictment on November 7, 2022. The Court denied the motion on December 14, 2022. King was tried before a jury and convicted on May 17, 2023. The government sought

forfeiture of King's firearm inventory, and the jury approved that forfeiture on May 18, 2023. King filed the present motion for relief under Rule 29 on June 7, 2023.

## II. FACTUAL BACKGROUND

Between October 24, 2019, and March 16, 2020, the defendant, Reuben King, sold five firearms to the same undercover police officer in three separate transactions. The transactions were all audio- and video-recorded. During the transactions, King offered numerous different longarms for sale and discussed the features of the various offerings with his "customer" before the final purchases were completed. The transactions took place in a barn on King's property. The undercover officer saw, and filmed, an estimated 150 long arms marked with price tags and arrayed on tables in the barn for sale.

On June 11, 2020, ATF Special Agents Neil Zubaty and Nicholas Graham served King with a cease-and-desist letter. The letter admonished King that his firearms activity appeared to bring him within the definition of a dealer in firearms, and that he should cease and desist from those activities until obtaining a license as required by federal law, or possibly face prosecution. King told the agents that he did not sell firearms as a business, but rather only occasionally sold personal longarms for which he had no further use. King asked the agents to describe the process of becoming a licensed dealer, and signed the admonition, acknowledging that he received and understood it.

King did not heed the ATF admonition. In November of 2020, March of 2021, and December of 2021, King sold four firearms to two different undercover Pennsylvania State Troopers in three transactions. As before, the transactions were audio- and video-recorded. As before, King offered his "customers" a variety of longarms for purchase;

and as before, the troopers saw numerous longarms (between 50 and 100) displayed and marked for sale.

On January 12, 2022, ATF special agents executed a federal search warrant at King's barn. They recovered ample evidence of an ongoing gun selling business, including approximately 615 longarms, many marked with price tags; approximately 10,000 rounds of ammunition; detailed records showing thousands of purchases and sales of longarms over many years; apparent records and receipts for advertisements placed in a local newspaper offering firearms for sale under several names and phone numbers;[1] and even plastic bowls containing numerous pre-marked price tags sorted by various denominations. Included among the firearms were approximately 30 brand-new, almost identical Savage Axis rifles (26 in the same caliber), each in an unopened factory box, and all in a larger palleted shipping box; as well as a similar stack of 19 Silver Eagle shotguns (18 in the same gauge), also new in box.

Agents interviewed King. He acknowledged that he had continued to sell firearms from his barn after he received the ATF cease and desist letter. He claimed that he misunderstood the admonition. He also said that, though many of the guns in the barn were marked for sale, some of them were actually part of his personal collection and those of his sons. He was vague about the source of his guns, and claimed that many were from collections and auctions. He had no explanation for the pallet of brand-new guns.

---

[1] Agents later discovered that between October of 2019 and the date of the search in January of 2022, King posted numerous ads offering approximately 118 guns for sale. They also discovered ads dating as far back as 2014.

He said that he received many new firearms within the few months before the search, and planned to sell most of them.

### III. DISCUSSION

King now seeks relief under Rule 29 of the Federal Rules of Criminal Procedure. He repeats the unsuccessful arguments raised in his Motion to Dismiss Indictment, claiming that his actions were protected by the Second Amendment. He argues that the recent Court of Appeals decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), entitles him to relief. His arguments are meritless, and his motion should be denied. For King to prevail, he must show that his conduct in engaging in the business of selling firearms without a license was protected by the Second Amendment. As this Court previously held, he cannot do so.

#### A. The Second Amendment Does Not Provide an Individual Right to Deal in Firearms as a Business Without a License.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court stated that the Amendment protects the "law-abiding, responsible" citizen's possession of arms for the "lawful purpose of self-defense." *Id.* at 630, 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767-68 ("[W]e concluded [in *Heller* that] citizens must be permitted to 'use [handguns] for the core lawful purpose of self-defense.'").

Later, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Court held that the Second Amendment further protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Id.* at 2122. The Court set a clear standard: the Second Amendment must be applied based on its plain text. The Court stated:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2126 (quoting *Konigsberg v. State Bar of Cal*., 366 U.S. 36, 49 n.10 (1961)).[2]

Under this test, the threshold question is whether the conduct at issue is covered by the plain text of the Second Amendment. If it is not covered by the plain text, then it may be regulated. If it is covered by the plain text, then the government must provide historical justification for any regulation. According to *Bruen* this process begins "with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." Id. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576-77, 578 (2008)). The *Bruen* Court recognized that the first step of analyzing the "plain text" of the Second Amendment was "[i]n keeping with *Heller*." Id. at 2126. However, the *Bruen* Court rejected the post-*Heller* test that had developed among the

---

[2] *Bruen* struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home on the ground that the law was not supported by "th[e] Nation's historical tradition of firearm regulation." *Id.* at 2122, 2126.

circuit and district courts at the second step of the analysis, in which courts applied so-called means-end scrutiny (i.e., strict or intermediate scrutiny) to laws that were found to fall within the Second Amendment's "plain text." Instead, the Court held that an analysis of the "Nation's historical tradition of firearm regulation," not means-end scrutiny, is the appropriate standard for an evaluation of a law falling within the plain text of the Amendment. *Id.*

In *Bruen*, the question was whether "carrying handguns publicly for self-defense" was protected by the plain text of the Second Amendment. The Court concluded that it was. 142 S. Ct. at 2134. The Court held "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id*. at 2122.

Accordingly, under *Bruen*, for King to succeed in his motion, he must establish that the plain text of the Second Amendment guarantees him an individual right to engage in the unlicensed and unregulated commercial sales of firearms. Only then does the government have to justify regulating that conduct with historical analogues. The plain text does not guarantee King that individual right.

*Bruen* does not focus on implicit or corollary rights; it focuses on the plain text of the Second Amendment. King ignores *Bruen*'s clear and repeated statement of what the "plain text" of the Second Amendment covers. Drawing upon its earlier opinions in *Heller* and *McDonald*, the Court in *Bruen* reiterated that the "plain text" of the Second Amendment – in particular, "the right of the people to keep and bear Arms" – "guarantee[s] the individual right to possess and carry weapons in case of confrontation."

142 S. Ct. at 2119 (quoting *Heller*, 554 U.S. at 592). The Court repeatedly spoke of the covered conduct as "an individual right to self-defense." *Id.*; *see also, e.g., id.* at 2118 (Second Amendment "'surely elevates above all other interests the right of law abiding, responsible citizens to use arms' for self-defense" (*quoting Heller*, 554 U.S. at 635)); *id.* at 2118 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is the 'central component' of the Second Amendment right.'") (emphasis in original); *id.* at 2134 ("*Heller* further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offense or defensive action in a case of conflict with another person.'"); *id.* at 2135 ("self-defense is 'the *central component* of the [Second Amendment] right itself'") (emphasis in original).

In committing the conduct charged in the indictment, King did not seek "to keep or bear" firearms, or obtain them; nor was he prevented from doing so, and in fact he obtained and "kept" over 600 firearms on his premises. All of the offense conduct relates to King selling guns to other people, as a business, without first obtaining a license to do so. Because the plain text of the Second Amendment does not protect this conduct, the analysis can and should stop there. *Bruen* itself confirmed that, if the "regulated conduct" falls outside the Second Amendment, "then the analysis can stop there; the regulated activity is categorically unprotected." 142 S. Ct. at 2126 (quotation omitted). As will be discussed, the Third Circuit opinion in *Range* did nothing to change this.

Three of the Justices in the *Bruen* majority—to say nothing of the three Justices in dissent—wrote or joined concurrences emphasizing that the Court's holding was narrow,

and that *Bruen* would not provide relief for individuals like King. In his concurrence, Justice Alito emphasized "[a]ll that we decide in this case is that the Second Amendment protects the right of law abiding people to carry a gun outside the home for self-defense" and that a law that makes doing so "virtually impossible" may be unconstitutional." *Bruen*, 142 S. Ct. at 2159 (Alito, J. concurring). Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underscore that the Second Amendment allows a "variety" of gun regulations. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. concurring). He reiterated that the rights secured by the Second Amendment are not unlimited, and that the Court's decision should not be taken as casting doubt on "*laws imposing conditions and qualifications on the commercial sale of arms.*" *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. concurring) (quoting *Heller*, 128 S. Ct. at 2783) (emphasis added). This statement is consistent with Justice Kavanaugh's majority opinion in *McDonald v. Chicago*, 561 U.S. 742 (2010), which forcefully emphasized that: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms*.' We repeat those assurances here." *Id*. at 786 (citation omitted) (emphasis added).

      Thus, the majority's repeated focus on the Second Amendment's "central component" of an individual right to self-defense and the concurring Justices' express limitations of their views to that narrow holding underscore the fallacy of King's argument here. With the proper framework in mind, King's conduct in engaging in the

business of dealing in firearms without first obtaining a license to do so is not founded in the plain text of the Second Amendment and thus no further analysis – of historical tradition or otherwise – is necessary.

This Court, following the decision in *Bruen*, properly rejected King's position. The Court correctly stated that it "looks at the Second Amendment's plain text; it does not consider 'implicit' rights that may be lurking beneath the surface of the plain text." *United States v. King*, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022). The Court continued:

> Even if the Court assumed that there is an implicit right in the Second Amendment to buy and sell firearms in order to keep and bear arms, that is not the same thing as a right to buy and sell firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms. In other words, the Second Amendment does not protect the commercial dealing of firearms. King cites to two cases to support his argument that his alleged conduct is protected by the Second Amendment, but both cases confirm that the government may regulate the commercial sale of firearms. *See D.C. v. Heller*, 554 U.S. 570, 626-27 (2008) ("nothing in our opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms"); *see also United States v. Marzzarella*, 614 F.3d 85, 88 (3d Cir. 2010) (explaining that a regulation on "the commercial sale of firearms" is "presumptively valid").
>
> In sum, King is alleged to have violated the Gun Control Act by engaging in the commercial sale of firearms without a license. That conduct is not protected by the plain text of the Second Amendment. The Act does not stop King from keeping or bearing arms. The Act does not keep him from buying and selling firearms in order to maintain a private collection. Nor does the Act prohibit the commercial sale of firearms outright; it simply requires a license to do so. As a result, the Act does not violate the Second Amendment.

*King*, 2022 WL 17668454, at *3.

All courts to address the same question since *Bruen*, to our knowledge, have agreed with this Court's analysis, rejecting Second Amendment challenges by others, like

King, charged with unlawful sale of firearms without a license, in violation of Section 922(a)(1)(A). *See, e.g.*, *United States v. Flores*, 2023 WL 361868, at *2 (S.D. Tex. Jan. 23, 2023); *United States v. Tilotta*, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) (Curiel, J.) (stating, "the natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted. Thus, the plain text of the Second Amendment does not cover Mr. Tilotta's proposed course of conduct, and the government need not provide historical evidence that the regulation is consistent with the Nation's history of firearms regulation."); *United States v. Kazmende*, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (explaining that given the statements of Justices cited above, "It is of little surprise, then, that courts post-*Heller* (and post-*Bruen*, for that matter) have rejected the argument that the Second Amendment protects the right to commercially sell a firearm."), *report and recommendation adopted*, 2023 WL 3867792 (N.D. Ga. June 7, 2023).

Also notably, in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), the court presented an exhaustive discussion of the text and history of the Second Amendment, and concluded that "the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Id*. at 682. This decision predates *Bruen*, but nonetheless is entirely faithful to the later decision in *Bruen* in scrutinizing the text of the Amendment (to "keep and bear arms") and determining that the plain text does not provide an unfettered right to sell arms, thus ending the inquiry. *Teixeira* never reached the "means-end" step eliminated by *Bruen*.

Since this Court's post-*Bruen* ruling last December, the only further development, that prompted King's renewed motion, is the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc). In *Range*, the Third Circuit applied the *Bruen* standard to determine whether the plain text of the Second Amendment covered the proposed conduct of Bryan Range, who wished to possess firearms but was barred from doing so by 18 U.S.C. 922(g)(1), the felon-in-possession statute. The Court concluded that "Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller* . . . [s]o 'the Second Amendment's plain text covers [Range's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Range*, 69 F.4th at 103, quoting *Bruen* (internal cites omitted). Having found that Range's proposed conduct was protected by the plain text of the Amendment, the Court turned to an examination of historical tradition. The Court found no historical support for the firearm prohibition as applied to Range (whose only previous felony offense was over 25 years earlier, for making a false statement to obtain food stamps), and granted relief; however, it carefully noted that its decision was to be applied "narrowly," only to the party before the Court in that case.[3] It is clear that that decision, which concerned a different provision of Section 922, narrowly focused on an

---

[3] The government maintains that *Range*, which conflicts with rulings of other Circuits, *see, e.g.*, *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (holding that § 922(g) is valid as applied to a person who previously committed any felony), is wrongly decided, and preserves its position for reconsideration in light of future Circuit or Supreme Court precedent, including *United States v. Rahimi*, No. 21-11001 (cert. granted June 30, 2023), which the Supreme Court will consider next Term.

individual's right to acquire a firearm for hunting and self-defense, has no bearing on the issue this Court resolved earlier, regarding regulation of the commercial sale of firearms.

In sum, King cannot proceed past step one of the Second Amendment analysis set forth in *Bruen* and as applied in *Range*. *Heller*, *McDonald*, and Justice Kavanaugh's concurrence in *Bruen* all explicitly stated that the Court's opinions should not be seen as "cast[ing] doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *See Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at 787 (Alito, J.); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). The unlicensed dealing in firearms is not covered by the "plain text" of the Second Amendment, and thus no analysis of the "Nation's historical tradition of firearm regulation" is necessary or warranted. King was not deprived of any constitutional right by the requirement that he must be licensed to engage in the business of selling firearms.

King cites to pre-*Bruen* cases, none of which undertake the required textual analysis of the plain text of the Second Amendment, and all of which applied the two-step process explicitly rejected by *Bruen*. He places special reliance on the *dicta* found in a footnote in the now-abrogated Third Circuit decision in *United States v Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). *Marzzarella*, however, had nothing to do with a right to engage in the business of dealing in firearms without a license. The case concerned a defendant's possession of a firearm with a defaced or obliterated serial number, in violation of federal law. The defendant challenged the constitutionality of the statute forbidding the possession of a firearm with an obliterated serial number. The Court upheld the statute. In its analysis, the Court recognized that "[a]t its core, the Second

Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home. . . . And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes . . . ." *Id.* at 92, citing *Heller*. Thus, the Court determined that a restriction of Marzzarella's ability to possess a firearm, even one lacking a serial number, was covered by the Second Amendment. While discussing two alternate readings of *Heller*, in a footnote the Court used the commercial sales of firearms as an example of how the now-abrogated "second step" would be hypothetically applied under its reading of *Heller*, writing that:

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading. *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of firearms." 128 S.Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010). This statement is dictum, and moreover, it does not address this case. The present matter does not involve a prohibition on the commercial sale of firearms. It involves a regulation of the sale of firearms, which was not considered in *Marzzarella*. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 688 (9th Cir. 2017) ("*Marzzarella* did not consider a situation in which the right of citizens to acquire and keep arms was not significantly impaired, yet commercial retailers were claiming an independent right to engage in sales.").

King additionally cites to *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), another pre-*Bruen* case. In *Ezell*, the Seventh Circuit held that an outright ban on shooting ranges within city limits was impermissible. The Court, citing *Heller*, recognized the core of the Second Amendment right, writing that "the 'central component' of the Second Amendment is the right to keep and bear arms for defense of self, family, and home." *Id*. The Court engaged in the now-abrogated two-step analysis and held that there was an implied right to acquire and practice with firearms that was "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id*. at 708.

Contrary to King's argument, neither *Marzzarella* nor *Ezell* establishes that there is an unlimited individual right to sell firearms, as a business, without a license, to be found in the plain text of the Second Amendment. To the contrary, both courts recognize that the core of the Second Amendment rests on the individual right to keep and bear arms, a right that King was not denied, as this Court previously held.

**B.     The Requirement of a License to Deal in Firearms as a Business is Consistent With the Nation's Historical Tradition of Firearm Regulations.**

Even if King had carried his burden to show a free-standing individual right to deal in firearms without obtaining a license to do so in the plain text of the Second Amendment, and the Court moved to *Bruen*'s second step, King's argument still fails. The regulation of the firearms trade has support in the nation's historical tradition of firearm regulations.

The Supreme Court provided some guidance on how the historical analysis should proceed. When comparing modern and historical gun laws, courts must "reason[ ] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2131 (quotation marks omitted). *Bruen* offered no "exhaustive survey of the features that render regulations relevantly similar," but it established as the central inquiry, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2133. In conducting a historical inquiry, the Court must give greatest weight to the laws of "the Colonies and early Republic," as well as to the period of English law between 1660 and 1688. *Bruen*, 142 S. Ct. at 2140-42; see also *Heller*, 554 U.S. at 594-95. Early post-ratification sources are also "a critical tool" to discern "public understanding of a legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 605 (emphasis omitted); *see id*. at 606-08 (discussing legal commentaries from 1825 and 1833).

"[A]nalogical reasoning" is not "a regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in original); see also *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."), abrogated in part on other grounds by *Bruen*, 142 S. Ct. at 2111. "So even if a modern-day regulation

is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

Applying this standard, the licensing requirement in Section 924(a)(1)(A) is analogous to a variety of historical laws regulating firearms and gunpowder. Colonial and state legislatures "substantially controlled" and regulated the trade of firearms. *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc). For example, Connecticut banned residents from selling firearms outside the colony. *Id*. Virginia similarly provided that people were only at "liberty to sell arms and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id*. at 685 n.18 (quotation marks omitted). At least five colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id*. at 685 (citing 17th-century laws from Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1809) (1763 law); Laws and Ordinances of New Netherland 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). All these laws show that colonial legislatures were empowered to regulate the movement of firearms between private parties.

**CONCLUSION**

In light of all the above the Court should deny King's *Motion to Set Aside The Verdict And Forfeiture Or Alternatively, Renewed Motion To Dismiss Indictment.*

        Respectfully submitted,

        JACQUELINE C. ROMERO
        United States Attorney


        /s/ *Robert A. Zauzmer*
        ROBERT A. ZAUZMER
        Assistant United States Attorney
        Chief of Appeals


        /s/ *Joseph A. LaBar*
        JOSEPH A. LaBAR
        Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing response of the United States to be served **electronic filing/ e-mail** upon counsel for defendant:

>Joshua Prince, Esq.
>Civil Rights Defense Firm, P.C.
>646 Lenape Rd
>Bechtelsville, PA  19505


 /s/ Joseph A. LaBar
JOSEPH A. LaBAR
Assistant United States Attorney

Date:  July _____ 2023.