**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff | : | **CRIMINAL NO. 22-215** |
| vs. | : | |
| RUEBEN KING, | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW, Defendant Rueben King, through his undersigned attorney of record Robert E. Barnes, and respectfully files this Sentencing Brief for this honorable Court's consideration in determining a reasonable and a just sentence that inspires confidence in the criminal justice system amongst all, as articulated under *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. §3553(a), and its progeny. Mr. King is scheduled to be sentenced by this Court on January 23, 2024, at 2:00 p.m.

## SUMMARY

Rueben King is an Amish farmer with an 8th grade education who failed to get a federal firearms license to sell firearms when building up his gun collection. He is not the merchant of death, the criminal defendant the government exchanged to Russia for a WNBA player. The sentence that would be no greater than necessary to meet the mutual goals of correction and rehabilitation in this case would be a base level of 6 under the guidelines, as consistent with the sentences traditionally meted out by fellow federal courts for comparable defendants.

**PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

Mr. King, a 46-year-old Amish farmer with an eighth-grade education, from Lancaster, Pennsylvania, prioritizes his life around his ten children with his wife of many years and serving the Amish community he grew up in, providing essential employment and services to that community. Mr. King also spent a lifetime hobby building a gun collection. He never obtained a federal firearms license. In one of the rarest prosecutions ever brought, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment charging him with dealing in firearms without a license, in violation of 18 U.S.C. §§922(a)(1)(A) and 924(a)(1)(D). Mr. King has no criminal history of any kind.

The rarity of the prosecution is reflected in the studies of the Sentencing Commission that didn't anticipate anyone like the defendant being prosecuted under these charges; instead, the Commission anticipated, based on past custom and Congressional intent in drafting the laws, the use of this charge prioritize arms dealers and gun-runners using the black market to target guns toward career criminals, drug dealers, gang members, and other intended unlawful and criminal use. The study concluded a much more "stringent" limitation on those charged than currently fits this case, as it assumed the charges would only apply to criminal offenders who "distributed the weapons to persons with intended unlawful uses for the firearms." See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.34. As the Department of Justice's own firearms sentencing study revealed: "the intent of Congress that the statutes and their penalty provisions provide for harsh punishment where the offender is not a law-abiding citizen." FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.34.

The case also presents a unique loss to the defendant: his lifetime hobby of gun collection. The government seized his entire collection of over 600 guns and seeks their forfeiture. This, too, is a rarity: using the unlicensed sale of a few guns to seize and forfeit an entire collection of lawfully possessed and lawfully used guns. A Notice of Forfeiture of firearms and ammunition, pursuant to 28 U.S.C. §2461(c) and 18 U.S.C. §924(d), accompanied the Indictment. Trial began in this matter on May 16, 2023, and the jury returned a guilty verdict on the single count charged. Dkt. 48. A forfeiture finding followed. Dkt. 52.

Of note, at all times, Mr. King obeyed the terms of his release, cooperated with the pre-sentencing report's investigation (turning over all documents and materials he was asked for including business information and tax returns), committed no offenses on release, quit selling and buying firearms, and has no criminal history of any kind.

**Guidelines Calculation**

The defense asserts a guideline range of base level 6, with criminal history category 1, affording broad discretion to the court for a probationary sentence, or a sentence utilizing home confinement and other alternatives to incarceration in a federal prison. The government asserts a level 22 with a criminal history category 1, seeking a near-maximum sentence under the statute, by making the base offense level 12 and adding a unique 10-level sentencing enhancement intended for arms dealers and gun runners to criminals. Of note, even the offense level of 12 would translate into Zone C of the Sentencing Table with a suggested range of 10-16 months, and the court vested with discretion to give probationary sentences, home confinement, and comparable options intended for defendants like Rueben King, as well.  Certainly, even if the offense level is 12, a sentence of extended probation with conditions, would be reasonable.

The Sentencing Commission's own study acknowledged the guideline's current level-12 elevation assumed a much more "stringent" limitation on those charged than currently fits this case, as it assumed the charges would only apply to criminal offenders who "distributed the weapons to persons with intended unlawful uses for the firearms." See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.34. The study acknowledged a level 6 appropriateness for technical violators who are not professional gun runners for criminals. See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.39. In conformity thereto, the Guidelines recommend reducing any case to a level 6 when the surrounding circumstances show the intended use of the guns was "lawful sporting purposes or collection." Sentencing Guidelines 2K2.1(b).

The government seeks to add a 10-point, specific offense characteristic enhancement, citing the number of firearms in King's collection that they seized. Presentence Investigation Report ¶ 21. The government cites no analogous case that has ever applied this firearm enhancement in this manner to a case like this one. The defense objects, noting the guidelines themselves, the history of the guidelines, the studies by the Department of Justice on this aspect of the guidelines, the purpose and legislative history of the statute itself all rebut any attempt to add this enhancement to this case. In contrast, the guidelines recommend reducing the level to a level 6 under the facts present in this case.

Equally, the original report also established that the enhancement the government seeks here long came with the critical proviso: "only those firearms possessed unlawfully are intended to be counted for purposes of the Firearms Table." FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at

p.46.  As the Guidelines Commentary Application Note 9 of the 2K2.1 clarifies: for "purposes of calculating the number of firearms under subsection (b)(2). "only those firearms that were unlawfully sought to be obtained, unlawfully possessed or unlawfully distributed" are to be included. Federal courts reinforce this rule. *United States v. Ahmad*, 202 F.3d 588, 591-92 (2nd Cir. 2000) (only illegal firearms count for this enhancement). The very basis for these guidelines concluded this enhancement would only apply to criminal offenders who "distributed the weapons to persons with intended unlawful uses for the firearms." See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.34.

## ARGUMENT

We are still judged by people, not by AI, a human empowered to look at the entire situation, not do sentencing-by-grid like a math calculator. That requires the meaningful exercise of discretion vested in this court to do justice within the intended purposes of the criminal laws at issue and the criminal justice system generally. The Supreme Court revested this court with that power when it ruled that the mandatory nature of the Federal Sentencing Guidelines offend the Sixth Amendment. *See Booker*, *supra*, 543 U.S. 220.

### Legal Standard

Pursuant to *Booker* and its progeny, the Court must impose a sentence that is not greater than necessary to satisfy the statutory purposes of sentencing and, to do so, must consider all the characteristics of the defendant and circumstances of the offenses and, if necessary, reject advisory guidelines that are not based on national sentencing data and empirical research. *See*

*United States v. Booker*, 543 U.S. 220 (2005).[1] The appropriate legal standard is to employ a "just deserts" approach to sentencing. "Just deserts" requires that: "From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).

After *Booker*, the Sentencing Guidelines are "effectively advisory," not mandatory. *Id.* Thus, This Court's authority has been restored to its pre-guideline judicial function of evaluating all statutory factors relevant to sentencing, instead of just those factors the Sentencing Commission deemed permissible. *Gall*, *supra*, 552 U.S. at 50. The factors set forth in 18 U.S.C. § 3553(a) must also be considered in fashioning the appropriate sentence. *See ibid.*, *Booker,* 543 U.S. at 261 (sentencing guidelines are but one of many statutory concerns that federal courts must take into account during sentencing determinations). 18 U.S.C. § 3553(a) states in pertinent part: the court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. The only issue now before the court is determining what sentence would be sufficient, but no greater than necessary, to meet the goals of 18 U.S.C. § 3553.

In arriving at the appropriate sentence, Section 3553(a) directs the Court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

---

[1] *See also Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Spears v. United States*, 555 U.S. 261 (2009); *Nelson v. United States*, 555 U.S. 350 (2009)

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *Booker*, *supra*, 543 U.S. at 268–69.

Other statutes also direct a district court in sentencing a defendant. Under 18 U.S.C. § 3582, a sentence involving incarceration is subject to the following limitation: "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall […] recogniz[e] that *imprisonment is not an appropriate means of promoting correction or rehabilitation*." 18 U.S.C. § 3582 (emphasis added).

Further, the Supreme Court has directed the sentencing judge not to presume "that the Guidelines range is reasonable," but to "make an individualized assessment based on the facts presented." *See Gall*, *supra*, 552 U.S. at 52. In *United States v. Diaz-Argueta*, 447 F.3d 1167, 1172 (9th Cir. 2006), the Court stated that "sentencing is a difficult art. It is easy to make it mechanical. It is, however, an act of reason as the judge looking at this particular person and the

circumstances of the crime that this particular person has committed makes a judgment following the prescriptions of the statute." *See also United States v. Ameline*, 400 F.3d 646, 655–56 (9th Cir. 2005) [advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence."] *rehearing en banc granted*, 401 F.3d 1007 (9th Cir. 2005). The exercise of judicial sentencing discretion is reviewed for "reasonableness," based on the statutory directive that the "court shall impose a sentence *sufficient, but not greater than necessary*, to comply" with the 3553(a) factors. 18 U.S.C. § 3553(a) (emphasis added).

Under the facts and circumstances attendant to this case, the sufficient sentence necessary to meet the mandates and goals of 18 U.S.C. § 3553 is 60 months of extended probation, community service, and public education within the community as to obtaining a proper license for firearms sales. Such a sentence conforms to "similarly situated defendants" as well as "not unreasonably harsh" from "the defendant's standpoint," where the defendant will already suffer a forfeiture of his entire life's gun collection, a price ten times higher than the permissible fine.

Fellow courts, like a panoply of scholars studying this precise issue, warn against such incarceration-first remedies for first-time, middle-aged, non-violent, non-gang, non-drug offenders, and focus on restorative justice, that requires the defendant live in the community he harmed, serve the community he harmed, and pay the price in reputational and financial terms while he, very publicly, restores the community through the labor and skill he can service the community with. It is, and remains, one of the most ancient forms of justice over communities far, and wide, across geography and time. Overcrowding, prison violence, hostility to dissident religions like the Amish, poor medical care, already burden our prison system. *See* Government Accounting Office, *Bureau of Prisons: Growing Inmate Crowding Negatively Affects Inmates,*

*Staff, and Infrastructure*, GAO-12-743 (September 12, 2012); Derek Gilna, PRISON LEGAL NEWS, *GAO Report Finds Federal Prison Overcrowding Accelerates* (Sept. 9, 2016).

This case concerns what the DOJ's own studies and surveys called a "technical" violation of the firearms laws, which the study's authors assumed prosecution would be relatively rare. King was not running guns to criminal cartels, forging documents, scraping off serial numbers, marketing guns to drug dealers or selling firearms for unlawful use. The guns were lawfully owned for lawful purposes, not criminal purposes.

The government would treat King as if he is the Merchant of Death, rather than the Amish farmer with an 8th grade education, no criminal record, a key supporting member of his community, who simply ran afoul of the licensure rules our government increasingly imposes on more and more people. He is precisely who the Guidelines recommend, and past sentencing of fellow federal courts cited in the government's own last study of the subject, typically receives a sentence focused on rehabilitation to the community, not extended sentences of imprisonment.

### A. Sentencing Commission's Own Studies Show A Low Sentence in Comparable Cases is Traditional.

As the Sentencing Commission's own surveys and studies showed, in 1989, during the discretionary era of sentencing in the last full survey done on sentences in this category when establishing and originating these very guidelines, defendants selling guns that were otherwise lawful guns to possess and were not sold for criminal use received a 3-month sentence on average. FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.42. Overall, even when selling firearms for unlawful purposes, "defendants involved in firearms sales received an average nine-month sentence" and "80% of defendants were sentenced at or below the lower end of the range". FIREARMS AND

EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.42. This conforms to Congress' purpose to focus sentencing on gun-runners knowingly selling guns for criminal use of the firearm, the drug trade, and especially dangerous or destructive devices. FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.10. As the Department of Justice's own firearms sentencing study revealed: "the intent of Congress that the statutes and their penalty provisions provide for harsh punishment where the offender is **not** a law-abiding citizen." FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") (emphasis added).

The study further admits the guideline's current level-12 elevation assumed a much more "stringent" limitation on those charged than currently fits this case, as it assumed the charges would only apply to criminal offenders who "distributed the weapons to persons with intended unlawful uses for the firearms." See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.34. By contrast, the study acknowledged a level 6 appropriateness for technical violators who are not professional gun runners for criminals. See FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT (Dec. 11, 1990) ("FIREARMS REPORT") at p.39. In conformity thereto, the Guidelines recommend reducing any case to a level 6 when the surrounding circumstances show the intended use of the guns was "lawful sporting purposes or collection." Sentencing Guidelines 2K2.1(b). Avoiding unwarranted disparities is also an objective of sentencing, even consecrated in Constitutional due process principles, and that too warrants a probationary sentence or sentencing involving home confinement, not a sentence of extended incarceration. The sentence recommended by the defense avoids unwarranted disparities, as well.

### B. Harsh Punishments for First-Time, Non-Violent Offenders Deters Justice, not Crime.

Imprisonment "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment." *Gall*, *supra*, 552 U.S. at 54 (internal quotation omitted) (quoting with approval a district court's reason for departing down from the guideline range to impose a sentence of probation in a case involving distribution of ecstasy). In fact, the United States Code explicitly instructs Courts that, in determining a sentence, it shall recognize "that *imprisonment is not an appropriate means of promoting correction or rehabilitation*." 18 U.S.C. § 3582 (emphasis added).Moreover, the legislative history of §3553 explicitly recognized "that we do not know very much about how to deter criminal conduct or rehabilitate offenders. Subsections (b)(1) and (c) is designed to encourage the constant refinement of sentencing policies and practices as more is learned about the effectiveness of different approaches." S.REP. 98-225, 161 (1984) U.S.C.C.A.N. 3182, 33344 (1983).

The empirical research regarding non-violent, first-time offenders, like King, shows no difference between the deterrent effect of non-incarceration sentences and that of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect" on comparable cases; Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448–49 (2007). Survey after survey affirms the same. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28; *see also* Sent'g Comm'n, *Recidivism and the "First Offender"*, at 13–14 (May 2004). Hence, a lengthy sentence

of incarceration will not provide an additional deterrent effect, particularly since King is a first-time, non-violent defendant, with well-established ties to family and the community.

A sentencing court should consider whether a defendant is a first-time offender, like King. *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) [upholding downward variance on basis of defendant's first-offender status]; *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ["the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"]; *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) [affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime]; *United States. v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) [considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties]; *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) [granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"]; *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) [basing variance in part on defendant's age upon release because recidivism drops substantially with age]; *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) [granting variance to 57-year-old defendant because recidivism drops with age]; *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) [granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense].

Furthermore, King has a low risk of recidivism, which also warrants a downward variance in his sentence. The risk of recidivism rate for all defendants convicted of a white-collar, non-violent offenses is extremely low. *See* D. Weisburd, E. Waring & E. Chayet, *Specific*

*Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (funded by National Institute of Justice); Daniel Glaser, *Effectiveness of a Prison and Parole System*, pp. 36–37 (1964); P.B. Hoffman & J.L. Beck, *Burnout -- age at release from prison and recidivism*, 12 J. Crim. Just. 617 (1984). Additionally, a number of other characteristics of King suggest that he is unlikely to recidivate *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, (Res. Ser., rel. 1, May 2004) (*Measuring Recidivism*). Because King's individual characteristics indicate that he is unlikely to recidivate, a lengthy sentence of incarceration would only increase his risk of recidivism. Offenders are most likely to recidivate (25.6%) when their sentence is a straight prison sentence. *See Measuring Recidivism* at 13. On the other hand, of offenders sentenced to a probation only sentence, only 15.1% recidivate, and offenders serving a sentence of probation combined with confinement alternatives have a rate of 16.7%. *See ibid.*

By contrast, increasing incarceration for such individuals increases the risk to the community, noting the "criminogenic effects" of imprisonment including "contact with more serious offenders, disruption of employment, [and] weakening of family relations," and comport with comparable surveys and studies of the same. *See* U.S. Sent'g Comm'n, *Staff Discussion Paper, Sentencing Options Under The Guidelines* (Nov. 1996); *see also* Miles D. Harar, *Do Guideline Sentence for Low-Risk Drug Traffickers Achieve Their Stated Purpose?*, 7 Fed. Sent. Rep. 22, 1994 WL 502677 (July/August 1994) [increasing incarceration negatively impacts recidivism]; Sentencing Project, *Incarceration & Crime: A Complex Relationship*, 7–8 (2005) ["The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society…and contribute to an increase in recidivism"].

Courts and Congress alike took notice. Increasingly across the country, federal judges routinely call for less punitive sentences in many such cases. *See* U.S. Sent'g Comm'n, *Summary Report: U.S. Sentencing Commission's Survey of Article III Judges* (Dec. 2002) [noting the large number of federal judges who requested less incarceration sentences for fraud cases].

### C.  A Lengthy Sentence of Incarceration Will Not Provide an Additional Deterrent Effect.

Research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence."); *see also* Zvi D. Gabbay, Ex*ploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447–48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

As discussed above, research regarding non-violent offenders in particular found no difference in the comparative deterrent effect of probation and that of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect.").

### D.  18 U.S.C. § 3553(a)(1), (2)(D) – Nature and Characteristics of King.

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d

506, 513–14 (S.D.N.Y. 2006).

Defendants that show exemplary character outside of the conduct for which they have been convicted, and who enjoy support of friends, family, colleagues, and community leaders, a sentence outside the Guidelines is appropriate. *See United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (upholding probation where guidelines range was 41–51 months for creating counterfeit access device where district court had found that defendant was remorseful, was employed, supported his daughter, and no longer posed a threat to community). Finally, the best candidates for crime-free futures are those who have, among other characteristics, no history of drug abuse, no present drug use, and a stable living arrangement with a spouse. *U.S. Sent'g Comm'n, Staff Discussion Paper, Sentencing Options under the Guidelines*, p.18 (Nov. 1996), available at http://www.ussc.gov/Research/Working_Group_Reports/Simplification/sentopt.pdf.

Courts recognize that a "truly extraordinary" charitable history serves as a basis for variance under 18 U.S.C. § 3553(a). *See, e.g., United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming a sentence of probation and three months' home confinement in a wire fraud case where the Guidelines range was 18–24 months but the defendant's life was marked by outstanding devotion to family, community, and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming three-month sentence for Medicare fraud conspiracy of more than $5 million (Sentencing Guidelines recommended five years of prison time) based on, among other things, defendant's charitable work, community service, generosity with his time and support and assistance of others). Even before *Booker*, charitable acts and community service were recognized as a basis for large departures from the then-mandatory Guidelines. *See, e.g., United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003), *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (upholding downward departure based on support letters referring to

defendant's "assistance, in time and money, to individuals and local organizations"); *United States v. Crouse*, 145 F.3d 786, 790 (6th Cir. 1998) (stating that "exceptional" record of community service was a proper basis for a downward departure); *see also, e.g., United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (finding charitable contributions relevant to sentencing where the contributions exceeded mere financial support).

Attached to this filing are 48 letters from King's family and community attesting to his good character. (Exhibits 1-48). As reflected in those letters, King is not an international, arms dealing criminal but a giving, self-made man dedicated to those closest to him, his family, friends, and community. "Reuben is the heart and soul of his family," write the Lozzis, Louis and Eileen. Ex. 35.

"Reuben is the one that keeps everyone, and everything connected, He sees that they have whatever is needed, groceries, medical care or transportation, He is present at all their school functions. Reuben provides them the guidance and knowledge of his Amish faith and ensures that they are connected to that faith in everything they do." Ex. 35.

Even for those who don't fully comprehend the Amish way of life Mr. King still stands out. "I have known the King family for many, many years. The Amish way of life is unique, and I must admit, one I still grasp to fully understand at times. However, measuring the quality of an individual is universal regardless of the lifestyle they lead. With these thoughts in mind, I must say that Reuben's character contains much greater good than not. His love of family, church and community can be seen in his daily life." Ex. 1.

Judge Turner continues with the practical reality of an incarceration of Mr. King, "The Kings are very tight knit with each member having responsibility for the functioning of the family unit. I mention this as I know the time will soon arrive for Reuben's sentencing. A

sentence requiring lengthy incarceration will have a very negative impact on the entire King family as well as the livelihood they depend on in their farming and foundry operation." Ex. 1.

A prolonged absence would have a cascading effect on not only King's family but the entire community. "Ruben's absence from the family farm where he Is the herdsman for the dairy will have a negative impact on the local community and Hoober Inc," submits Mr. Charles B. Hoober retired president of Hoober, Inc., A Case IH farm equipment dealer. "Over the years the King's business fabricated parts that were no longer available from our suppliers. We need Ruben to help support the business. Everyone Is productive in their small family Amish farm to make ends meet. Taking Ruben away or making his children come home to help on the farm would very much hurt the income stream of their business." Ex. 12. By all accounts, Mr. King is highly respected in his community and by those who have interactions with him.

In sum, a complete picture of Rueben King reveals a man committed to his community, caring for his neighbors, protective of his family, a source of warmth and employment to his community, and it is the reason that so many wrote to the Court affirming that they continue to trust and support him, and benefit from his presence in the community.

### E.  Forfeiture of a Life's Work is Punishment Enough.

In circumstances where the defendant has already suffered punishment by collateral consequence and where the defendant has a minimal risk of recidivism, leniency is reasonable and appropriate. *United States v. Gardellini*, 545 F.3d 1089 (DC Cir. 2008) [upholding non-guidelines sentence of probation and a fine for defendant convicted of filing false tax returns where guidelines range was 10-16 months because defendant, *inter alia*, had accepted responsibility, had a minimal risk of recidivism, had already suffered substantially, and the only

real deterrent in these cases are the efforts of prosecutors to enforce the laws, not harsh prison sentences].

Here, King's unique punishments as a result of his conviction warrant leniency in imposing a sentence. His life-long passion of a gun collection of note is completely lost, forfeited to the government in this case. The economic cost of that is more than ten times higher than the highest possible fine permitted under the law. The public humiliation of the case on him shamed him in a community that holds honor dearly. This collateral cost is dearly consequential.

Finally, a probationary sentence here would avoid unwarranted disparities with similarly situated defendants, as documented by the government's own study of the subject. Point in fact, it is exceedingly rare for people like King to ever be criminally prosecuted under this law, and the Justice Department anticipated they rarely would be. For those rare circumstances, it provided for reducing the base level to a level 6, which supports a probationary sentencing here.

## CONCLUSION

The conflict between an increasingly regulated society and an Amish way of life mostly foreign to such regulated licensures forms the context for this case. A potential loss of a lifetime of gun collection, worth an amount more than 10 times the permitted fine, is already being requested, and would, itself, be a harsh punishment. Any further punishment of extended incarceration -- in our prison facilities already overcrowded, violent, with poor medical care and often inmates subjecting religious dissidents to harsh discriminatory treatment -- of an old Amish farmer with no criminal record and a key member of the community will hurt the community more than it will help it. That is not a sentence "no greater than necessary" to achieve justice. The defense's request of an alternative sentence conforms to the intent of Congress, the customs of the courts, and a fuller understanding and application of justice in America.

DATED: January 16, 2024

By:    <u>/s/ Robert E. Barnes</u>
Robert E. Barnes
Counsel for Rueben King

Barnes Law, LLP
700 S. Flower St., Ste. 1000
Los Angeles, CA 90017
Tel: (310) 510-6211/ Fax: (310) 510-6225
E-mail: robertbarnes@barneslawllp.com

## CERTIFICATE OF SERVICE


It is hereby certified the foregoing SENTENCING MEMORANDUM was made through the Court's electronic filing and notice system (CM/ECF), or, as appropriate by sending of copy of the same by electronic mail to the following address:

Joseph A. Labar
U.S. Attorney's Office
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476
joseph.labar@usdoj.gov

Elizabeth Megen Ray
U.S. Attorney's Office - EDPA
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476
Elizabeth.ray@usdoj.gov


DATED this 16th day of January 2024.

/s/ Robert E. Barnes
Robert E. Barnes, Esq.